UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

KAREL G. JOHNSON, and
LISE H. JOHNSON, his wife,

Plaintiffs,

CASE NO. 00-6202-CIV-DIMITROULEAS
MAGISTRATE JUDGE JOHNSON

vs.

AUTOMOBILI LAMBORGHINI SpA,
MICHAEL KIMBERLY, JON DOE I,
JON DOE II, and JON DOE III, Individually,

Defendants.
_______________________________________/

**NOTICE OF TAKING DEPOSITIONS**

TO: Myron Shapiro, Esq.
Herzfeld & Rubin
Brickell Bayview Centre
80 SW 8th Street, Suite 1920
Miami, Florida 33130.

**PLEASE TAKE NOTICE** that pursuant to Fed.R.Civ.P. 30(b)(6), the undersigned attorneys will take the stenographic deposition of:

1. The person(s) at Automobili Lamborghini SpA with the most knowledge of other lawsuits and/or lemon law claims filed against Automobili Lamborghini, SpA involving the Diablo Roadster;

2. The person(s) at Automobili Lamborghini SpA with the most knowledge of customer complaints made regarding the Diablo Roadster.

3. The person(s) at Automobili Lamborghini SpA with the most knowledge of Lamborghini's Safety Recall Campaign 98 V 030;

4. The person(s) at Automobili Lamborghini SpA with the most knowledge of the design process for the Diablo Roadster with respect to the retractable roof and window system;

5. The person(s) at Automobili Lamborghini SpA with the most knowledge of the design process for the Diablo Roadster with respect to the battery and the electrical system;

6. The person(s) at Automobili Lamborghini SpA with the most knowledge of Lamborghini's marketing of the Diablo Roadster;

7. The person(s) at Automobili Lamborghini SpA with the most knowledge of the meeting held in the latter portion of 1995 at the Lamborghini plant at Sant' Agata, Italy, regarding the leaking problem in the Diablo Roadster.

8. The person(s) at Automobili Lamborghini SpA with the most knowledge of the oral representations made to the Plaintiffs prior to their Lamborghini purchase;

9. The person(s) at Automobili Lamborghini SpA with the most knowledge of any attempts to repair the Plaintiffs' Lamborghini;

10. The person(s) at Automobili Lamborghini SpA with the most knowledge of the accuracy of the content of the Affidavit of Paul Bianchi, attached hereto as Exhibit A;

11. The person(s) at Automobili Lamborghini SpA with the most knowledge of the accuracy of the content of the Affidavit of Nigel Gordon-Stewart, attached hereto as Exhibit B.

12. The person(s) at Automobili Lamborghini SpA with the most knowledge of the accuracy of the content of the Affidavit of Peter Stevens, attached hereto as Exhibit C.

13. The person(s) at Automobili Lamborghini SpA with the most knowledge of the following defects:

(a) Frequent jamming of the passenger and driver doors, thereby trapping the passengers inside (remedied only by placing car on a hydraulic lift and "springing" the doors open);
(b) Electronic windows, at times, cease to function;
(c) Severe damage to the Diablo's interior due to water leakage from rain creating a dangerous driving condition;
(d) Severe water damage to custom luggage, due to a water leak in the trunk of the car;
(e) Poorly designed windshield wiper which, when activated, pushes water

inside the car;

(f) Misplaced seat belt fastener that causes injures to the Diablo's operator's hands and fingernails each time operator engages the buckle and fastener;

(g) Poorly designed accelerator and brake placement, that results in the operators foot being locked behind the brake petal after depressing the accelerator;

(h) Poor vehicle aerodynamics and seal that cause extensive creaking and rattling while driving the car;

(i) Flashing of the steering control/ dashboard lights on a daily basis;

(j) The sunroof latches automatically detach and swing freely after the Diablo is driven over any type of bump, striking the driver and passenger in the head;

(k) Oil leaking onto the engine during use, causing intense smoke and a risk of fire;

(l) The Diablo's battery fails frequently and unexpectedly, stranding the driver and any passenger(s); this required the installation of an after market battery charger, which has not solved the problem;

(m) Little or no suspension, producing an extremely rough ride;

(n) The Diablo cannot travel over speed bumps in shopping centers, parking lots, housing developments, malls, gas stations, grocery stores, etc., (even when the vehicle is elevated), resulting in damage to the front fender and bottom of the vehicle;

(o) The Diablo's defective design of the gas tank and its inability to properly accommodate a U.S. gas hose nozzle make it difficult to fill the Diablo with gas, creating a 10-15 minute project each time the Diablo is refilled.

(p) The Diablo cannot be parked in traditional parking spaces because the vehicle is so low to the pavement that the front end of the vehicle makes contact with the cement parking stop causing front end damage.

(q) The black metal rear vent/grill and the Diablo emblem have discolored and has aged disproportionally with the rest of the vehicle creating an eyesore;

(r) Required adjustment for loose passenger seating, and continues to be loose;

(s) The air conditioning works infrequently and when it does work it fails to cool the interior of the Diablo;

(t) The steering control "error" light remains on at all times.

(u) The steering wheel position lock is defective which causes the steering wheel to drop down and strike the driver in the knees while operating the vehicle;

(v) The interior leather on the seats, door and dashboard is discolored, stained and shows signs of accelerated aging due to water saturation from the electric windows and door seals malfunctioning and allowing large quantities of water to enter the vehicle;

(w) While operating, the targa roof latches can spontaneously release causing a risk of total detachment;

(x) Severe burns from the engine can result from one attempting to check the oil with the "dipstick".

The depositions will be taken on ______________, 2001 commencing at _______. at ______________________________ upon oral examination before Larry Wasserman & Associates, or any other officer authorized by law to take depositions in the State of Florida. The oral examination will continue from day to day until completed. The depositions are being taken for the purpose of discovery, for use at trial, or for such other purposes as are permitted under the Rules of Court.

**I HEREBY CERTIFY** that a copy of the foregoing Notice of Taking Depositions was sent via facsimile and U.S. Mail to the above named addressee this 10th day of August, 2001.

BRINKLEY, McNERNEY, MORGAN,
SOLOMON & TATUM, LLP
*Attorneys for Plaintiffs*
200 East Las Olas Boulevard, Suite 1900
Fort Lauderdale, FL 33301
Telephone 954-522-2200 / Facsimile 954-522-9123

By:______________________
HARRIS K. SOLOMON
Florida Bar No. 259411
MARK A. LEVY
Florida Bar No. 121320

G:\WPFILES\CLIENTS\Johnson.Karel\Lamborghini\Pleadings\N-Depo Lamborghini SpA

# EXHIBIT A

Affidavit of Paul Bianchi

STATE OF FLORIDA )
COUNTY OF DUVAL )

BEFORE ME the undersigned, an officer duly licensed to take acknowledgments, appeared Paul Bianchi first being sworn, deposes and says

1 My name is Paul Bianchi, I am over the age of 18 I reside at Castello of Rivalta #26 Gazzola, Placenza, Italy 29100

2 I am the former Executive Director of Automobili Lamborghini S p A. I held this title from March 1994 to December 1996. I worked for both Lamborghini USA, Inc. at that time known as (LUSA) and Automobili Lamborghini S.p.A., (ALSPA). I was transferred from LUSA to ALSPA in Sant' Agata, Italy on direct orders of Michael J Kimberley, President of ALSPA. I remained on the payroll of LUSA but was given my job instructions, assignments, and supervision by ALSPA. I always reported directly to the President of ALSPA, Michael J. Kimberley, when working at LUSA. I have first hand personal knowledge that all LUSA Executive Management reported directly to Michael J. Kimberley at ALSPA and that both companies function together as one integrated enterprise and are alter-egos of each other. My annual salary was $100,000. plus expenses.

3. I was also a member of the Executive Committee Group of ALSPA. This committee developed and implemented all company business planning, policies, marketing strategies and new car product development.

4. As Executive Director of ALSPA/ALUSA I was empowered with total operating authority over ALSPA and LUSA. I was given this authority by Michael J. Kimberely, President of ALSPA.

5. As Executive Director of ALSPA, I worked directly under Michael J. Kimberley, President of ALSPAand my office was located next to his with a private connecting door. I functioned as an interpreter for Mr. Kimberley, who spoke no Italian. I executed all directives of Mr. Kimberley in Italian as necessary. I reviewed, translated, processed and/or generated all company confidential documents, communications and directives as instructed or became necessary in Italian. I also attended inter-company meetings in place and on behalf of Mr. Kimberely. These meetings were conducted in Italian, and were only attended by Senior Management. Therefore I have first hand knowledge of all company operational activities such as personnel, sales, production, engineering and quality control.

6. After the acquisition of ALSPA and LUSA by the shareholders from Chrysler Corporation in 1994, it was decided by the management and shareholders that ALPSA and LUSA should share a common name and with the use of "Automobili" added, be presented to the world market as one and the same. The USA company was then re-named "Automobili Lamborghini USA, Inc." and was internally referred to ALUSA thereafter. ALSPA kept its name which was "Automobili Lamborghini S.p.A." and both companys were always referred to and recognised as one.

Affidavit of Paul Bianchi
Page 2

7. As an Executive Director of ALSPA, I have first hand knowledge of a number of design, manufacturing and mechanical defects on Lamborghini automobiles beginning with the 1991 model year Diablo's through to and including the 1997 model year Diablo VT Roadsters. I attended and participated in many meetings where defects in the Lamborghini Diablo and Lamborgini Diablo VT Roadster were reviewed and discussed with absolutely no resolution to resolve the defects. These meetings were routinely attended by the Senior Italian Management, Gianfranco Venturelli, Luigi Mamiorli and G. Girotti, who instructed Senior Engineer, Massimo Ceccarani, Quality Control Manager, Brando Aldovrandi and other operations personnel to ignore these defects because in their view "there were no defects".

8. I also had conversations and meetings with numerous factory employee's who identified numerous Lamborghini Diablo VT Roadster defects from various departments within Lamborghini. These included paint, engineering and the actual manufacturing production line. Employee's were instructed by Senior Italian Management, not to speak to anyone about the defects.

9. From the time of the first testing of the Lamborghini Diablo Roadster there were a number of mechanical problems. One very severe problem is that when the car is driven in the rain, large quantities of water leak into the vehicle through the driver and passenger side windows. This was a known engineering defect by ALSPA/ALUSA Executive Management and the ALSPA Engineering Department as well as manufacturing personnel prior to marketing the car for sale to the public.

10. The leaking is so severe that many Lamborghini Diablo Roadsters cannot be driven in the rain due to flooding that occurs in the vehicles. The water enters the vehicle through the window side molding or roof, and in heavy rains can blind a driver while operating the vehicle.

11. On one occasion, I attended a meeting held at the factory in Sant' Agata, Italy. This meeting took place out on the factory production floor and assembly line. The meeting was held to address the leaking defect on the Lamborghini Diablo VT Roadster. Present at this meeting were: Gianfranco Venturelli, Director General of ALSPA, Michael J. Kimberley, President of ALSPA, Luigi Mamorlli, Director of Engineering at ALSPA, Robert Braner, President and Chief Executive Officer of ALUSA and representatives of the vendor who was supplying the sealing gasket for the roof. During the meeting the vendor stated that the engineering design for the gasket supplied by Mr. Mamiorli would not work and that is why the leaking problem continues to exist. Mr. Mamiorli and Mr. Venturelli became very angry and began yelling. I explained the leaking problem and design problem to the others. Venturelli and Mamiorli began screaming and yelling at me that the leaking defect would not be corrected as it would delay meeting the required production demands. On behalf of Mr. Kimberley I insisted that the leaking defect be corrected. Luigi Mamorlli continued to scream at me and stated that he would personally have me murdered if I delayed production demands. I left the factory and went to the Italian police and filed a formal police report.


12. Several days later I was ordered by Michael J. Kimberley to "withdraw" the police report. Mr. Kimberley said he did not want any negative publicity at Lamborghini. I was afraid because Mr. Kimberley's personal driver was always armed and functioned as his personal bodyguard.

13. I have personally reviewed the gasket suppliers correspondence which reflects that the gasket design was defective and I have been present in several meetings when the supplier of the gasket has discussed the gasket design defects with ALSPA Senior management and the engineering personnel. Mr. Kimberley was repeatedly advised by myself and others that the design was defective.

14. It was recommended to the Italian Senior Management and Michael J. Kimberley by myself, Robert Braner and others that the company seek an outside engineering specialist to review and assist in correcting the problem. This was adamantly recommended many times but always refused. The initial budget allocation to correct the leaking defect alone was $100,000. However, ALSPA spent over $600,000 internally and were unable to correct the defect. The roof gasket design was prototyped 10 to 15 times due to the engineering defect. It still never worked and it was never corrected.

15. In my meetings with the employee's who worked in the paint department, I was told again and again of the paint contamination that had occured. When these problems were reported to Senior Management at ALSPA, the employee's were told to "keep quite".

16. In my meetings and conversations with engineering personnel and Senior Management, I was made aware of the many defects and problems with the Lamborghini Diablo VT including but not limited to:

a. Leaking fuel rails, resulting in vehicles catching on fire.

b. Glass delamination.

c. Transmission failures due to inadequate engineering design.

d. Clutch failures due to inadequate design.

e. Engine failure due to poorly designed pressure relief valves.

f. Severe overheating and melting of body parts on top of and behind the engine compartment.

g. Torsional rigidity problems causing excessive chassis and body flex.

h. Severe leaking problems around the driver and passenger side windows.

i. Power window failures trapping occupants inside.

j. Consistent electrical failures resulting from the battery's not holding a charge.

k. Under dash leaks of water into the driver and passenger compartments.

17. I participated in a number of marketing strategy meetings at ALSPA and I can confirm at one meeting with all Senior Italian Management in attendance as well as Nigel Gordon-Stewart, Marketing Director, Robert Braner, President of ALUSA and Barry Toepke, President of VL Communications our US public relations firm Sando Munari, ALSPA's public relations and Brando Aldovrandi, Manager of Quality Control it was directed by ALSPA that ALUSA must aggressively promote the Lamborghini Diablo VT Roadster as a "daily driving car" in the US

18. In late 1996, upon returning to the factory from a business trip on behalf of ALSPA, I discovered my office had been opened. My locked file cabinets and storage closet had also been broken into. Confidential documents, engineering files and records had been taken. I reported this to Michael J. Kimberley, President of ALSPA. Mr. Kimberley's personal driver Piero Macchia informed me that this had been done by Claudio Galli, Personel Director of ALSPA, upon the instructions of Vittorio DiCapua, because I had to much knowledge and documentation of the Lamborghini Diablo VT Roadster defects.

18. Based on my position as Executive Director at ALSPA/ALUSA, documents I have personally seen, meetings I have personally attended, and conversations I have had, I can confirm that the Diablo VT Roadster has severe design and engineering defects, and with the full knowledge of all ALSPA/ALUSA Executive Management, the automobile was manufactured and was sold to the public anyway. The vehicle is dangerous, defective, and is not a daily driving car as it was marketed to the public.

Paul Bianchi

The foregoing affidavit consisting of 4 pages was signed before me this 16th day of December 1998 by Paul Bianchi who produced identification and who did take an oath.

STATE OF FLORIDA NOTARY PUBLIC
TANYA R. ZEIGLER
My Comm. Exp. 4/29/2002
No. CC 738041
[ ] Personally Known [ ] Other I.D.

Tanya R. Zeigler

EXHIBIT B

AFFIDAVIT OF NIGEL R GORDON-STEWART

STATE OF FLORIDA )
COUNTY OF BROWARD )

BEFORE ME the undersigned, an officer duly licensed to take acknowledgements, appeared Nigel R Gordon-Stewart, being first sworn, deposes and says:

1. My name is Nigel Gordon-Stewart. I am over the age of 18. I reside at The Old Granary, Bramlands Lane, Woodmancote, Nr. Henfield, West Sussex BN5 9TR. ENGLAND.
2. From January 1994 to November 1995, I held the position of International Sales and Marketing Director of Automobili Lamborghini S.p.A. at Via Modena 12, Sant'Agata Bolognese (BO). My annual salary was US $120,000 plus expenses. I was given instructions and assigned duties by the President of Automobili Lamborghini S.p.A., Michael J Kimberley and the shareholder's executive management representatives (Baduraman Dorpi P. and Sudjaswin E.L.). I regularly interfaced with Automobili Lamborghini USA Inc. as part of my International Sales and Marketing Director role.
3. I was also a member of the Executive Committee group of Automobili Lamborghini S.p.A. This group was responsible for all company policy and strategy decisions.
4. When the company was acquired in January '94, the new management committee (prior to the creation of the later "Executive Committee") decided that both Automobili Lamborghini SpA and Lamborghini USA Inc. (known at that time as "LUSA") should share common heritage and that the USA operation "should be part of the factory". The USA company was therefore re-named "Automobili Lamborghini USA Inc." or "ALUSA" for short. This strengthened our representation of Lamborghini worldwide and we subsequently worked hand-in-hand with ALUSA in all areas of marketing, sales and new product development. The strength of the relationship was very strong and we functioned as one company. For example, in 1995, after the Chrysler Corporation terminated their new stock credit line to ALUSA Inc., ALSpA funded the supply of product to ALUSA Inc. directly to the value of US$6 – 7 million. In recent conversations with Michael Kimberley (September/October 1998) he admitted to me that this loss of credit support for ALUSA's flooring plan and the inability of the Malaysian shareholders to replace this credit line (as they had agreed and legally bound themselves to do at a shareholders meeting in Bali, Indonesia in April 1995) financially crippled ALSpA's future product development strategy and all research and

development budget allocations including the L144 (Diablo VT Roadster), the L140 (small new Lamborghini which was never introduced) and especially with respect to the introduction of the new replacement Diablo (project codename "L147") which should have been released in 1997 but still remains to be launched to this day.

5. The critical issues at that time were:

   (i) Limited funds were available for new product engineering;

   (ii) This was due to the diverting of funds to support ALUSA;

   (iii) This caused an effect which changed the entire product strategy of Automobili Lamborghini S.p.A. forcing increased emphasis on the rapid development of the L144 (Diablo VT Roadster) as this product had to support ALSpA right up to the introduction of the new replacement Diablo car in late 1997 or 1998.

6. The specific history of the Lamborghini Diablo Roadster VT (model code name "L144") dates back to the time of Chrysler Corporation's ownership of ALSpA. A concept model of a Diablo Roadster was presented at the Geneva autosalon in March 1992. The car was nothing more than a styling exercise and had no capacity to become a production model. On one of my initial visits to the factory in 1993, I was informed by Luigi Marmiroli that this styling exercise had been produced without a roof and with no intention of ever having a roof designed for it. The styling for the car was the work of Marcello Gandini.

7. When the Megatech Corporation took over ALSpA in January 1994 the production planning and development of two new versions of the standard Diablo were under development. The Diablo SE had already been launched in prototype form and consisted of a lightweight version of the normal Diablo with increased horse power. The other car was the L144 which was, at that time, in its initial styling phase. Some limited engineering work had taken place on the L144 with respect to the production of a chassis stiff enough to sacrifice the roof section which contributed significantly to the torsional rigidity of the standard Diablo coupe's chassis. This project required almost complete re-engineering of the Diablo's chassis and several other major components. In essence, the Roadster was basically a "new car" from the ground up.

8. Within the marketing department, we were very enthusiastic regarding the development of the L144. At that time, the Diablo 2WD and Diablo VT had been on the international markets for over two years and sales of these products had begun to decay. The Diablo SE was only planned to be a limited edition product with a short life-span The value of the L144 was therefore critical to the continued sales and marketing effort of ALSpA/ALUSA Inc.

1983

9. During the Summer of 1994, the Executive Committee were presented with the styling drawings of the L144 completed by Marcello Gandini. These designs were then adopted by ALSpA/ALUSA as the definitive styling of the L144. At that time however, the following issues were raised regarding the design and engineering of the car:

a) Was the torsional rigidity of the car sufficient to support a full "convertible" version of the Diablo?, and,

b) Was the design capable of being waterproof and not leaking?

Ing. Luigi Marmirolli (ALSpA Technical Director) assured the committee that both these issues and other known and long-standing problems experienced with the Diablo model at that time (poor brakes, low quality standards of paintwork, general assembly, over-heating within the engine compartment, poor quality components (e.g. car battery), poor air-conditioning performance etc.,) would not present a problem for the engineering department. The issue of the opening of the doors (which opened upward in a scissor-like fashion) with a convertible car was also raised. Ing. Marmiroli again confirmed that this would not present a problem. ALSpA had previously produced a convertible (Targa) car which was the Lamborghini Jalpa. The Jalpa retained the normal door opening/closing operating design presenting far less of an engineering problem. It was very clear to the Executive Committee that the combination of the scissor doors and the removable roof were going to create a major engineering problem.

10. I did not like the aesthetics of the Gandini design especially with the removable roof in place. It was clear from the styling that the main focus of the design programme involved minimal use of the car with the roof panel in place. I drew a parallel with the Mercedes 500SL stating that there were owners who used the car without ever removing the hard top section and that the aesthetics of the design with the roof in place or removed were the benchmark for this type of car. I was also concerned about the level of rigidity of the chassis structure. I was shown CAD simulations of the body flex by Ing. Marmiroli in the engineering department. The floor, door sills and centre tunnel had been stiffened by the addition of carbon fibre which Marmirolli "claimed" increased the rigidity of the structure by 11% over the standard chassis. I remained unconvinced as other senior members of the engineering department including Senior Engineer Massimo Ceccarani and Factory Test Driver Valentino Balboni had already made me aware of their own doubts about the design and the competence of Ing. Marmiroli.

198 

11. During this period, the L144 was planned for an introduction in December 1995 at the Bologna motorshow with full production commencing in March of 1996.

12. The exact status of the car was also planned to be the same as the Diablo SE30 as a limited edition car with a limited production build of around 200 units over a two year program. Over the next twelve months, this would be changed by the Executive Committee as marketing insisted that we needed the car to be in full production up to the introduction of the replacement Diablo model, the L147. Marketing also requested that it be built in two versions, both 2WD and VT as we anticipated that the L144 would substitute sales for standard Diablo 2WD and VT models after the car's introduction. In order for the company to maintain sales therefore, it was essential that the L144 became a "mainstream" product of ALSpA/ALUSA Inc.

13. The Lamborghini Diablo was not designed or ever intended to be an "everyday car" in any form or version. It is a low production, low volume, high performance sports/racing car for occasional use only. Every car is different from the last and there are good cars (fairly reliable) and there are bad cars (extremely unreliable). I was shocked to hear of comments made by Michael Kimberley, the president of ALSpA to the international motoring press at the Detroit Motorshow in January 1996 when he presented the Lamborghini Diablo VT Roadster as "an everyday car". To market these cars as everyday cars was a gross misrepresentation of the design, engineering levels, image and heritage of the vehicle. The Lamborghini Diablo Coupe and the Lamborghini Diablo VT Roadster are not technically sophisticated vehicles but high performance racing cars for the road which can be highly temperamental. Their high cost is based on exclusivity, their hand built nature, performance, styling and their name brand. The Italian management always referred to the cars as being similar to a "mistress" – high cost, high maintenance, unreliable, temperamental but fast, exciting and very beautiful. Lamborghini cars are not reliable enough for daily use.

14. During each Executive Committee meeting, the status of the L144 engineering programme was reviewed and during the Spring of 1995, it was clear that there were serious problems with the engineering of the L144 which were exactly the same as those identified by Michael Kimberley at the presentation of the initial styling layouts. Additional problems included the location of the roof panel (when removed) on the rear deck both in;

(a) How to do it and,

(b) The potential increase in the enormous heat retention from the engine which had already been a problematic area with the standard 2WD and VT Diablo.



15. The Lamborghini Diablo has a [illegible] litre V12 engine which runs up to a maximum of around 6800 rpm and as such generates extremely high levels of power (+ 492 bhp) and waste heat energy. The engine is located in the rear of the car in a "mid-engine" configuration. In this position the engine does not have the appropriate level of cooling airflow through the front of the car like a normal everyday sedan or even sports coupe. As a result, heat levels build up in all directions within the. very full, engine bay. The forward bulkhead and side sections of the engine bay are lined with a reflective material to avoid transmission of heat forward into the cabin of the vehicle or sideways towards the wheel hubs, brakes and tires which generate heat of their own. To the rear of the vehicle is also the exhaust box which additionally creates enormous heat and the underneath of the car is enclosed for aerodynamic reasons for high speed stability. Fans are used to cool the car's radiators which are also mounted in the mid-section/rear of the car behind and outboard of the passenger and driver's heads. This, combined with air flow into the engine bay through natural movement of the car, should move the extremely hot air out of the engine bay to the rear through the rear grille or upwards (natural direction) through slats in the rear engine deck. However, in reality, the dissipation of heat is fairly minimal. Instances of Diablo cars catching fire have been reported in the past. With high pressure fuel lines feeding a big engine and aluminium heat shields around the exhaust manifolds, once fire takes hold the level of fire damage is intense (This occurred to the first Lamborghini Diablo which came to the UK in 1991. The car was collected by a member of the staff of Lamborghini's importers in the UK and a member of the British motoring press ("Car" magazine). On the return journey to the UK the Diablo caught fire and was extensively damaged. This was documented in an article concerning the journey in "Car" magazine). The Diablo VT Roadster design proposed that we now placed a cover (the removed roof panel) over the rear engine deck. This was a potentially dangerous design proposal which could lead, at the least, to a customer burning their hands when trying to remove the roof after the car had been used or, at worst, a fire.

16. Michael Kimberley had engaged the services of Peter Stevens as consultant stylist/designer. Peter Stevens had previously been the designer/stylist for Lotus and McLaren as well as developing projects for TWR (Jaguar XJR15) and other automotive companies. The design of the L144 was such that, for the doors to open, the windows were required to drop approximately 1.5cms in a fraction of a second as the occupants pulled the levers to open the doors. This dropping of the windows allowed the top of the door glass to clear the roof section and seals. Without this system, the doors would not open and the occupants would be trapped inside. I was very sceptical about this design. My concern was based on

199



conversations with members of the engineering team including Ing. Marmiroli who also felt that this was a very complicated design/engineering problem. At this time, Michael Kimberley, Massimo Ceccarani (Senior Engineer at ALSpA) and I asked Peter Stevens to present alternative solutions to this problem. Peter Stevens and Ing. Marmiroli visited the design studios of Marcello Gandini in Turin and, on his return, Peter Stevens was highly critical of the current design, the main problems being:

(a) the door opening system
(b) the roof and door seals and
(c) the build-up and retention of heat around the rear engine deck and rear grille.

17. Peter Stevens' drawings were presented in an *ad hoc* meeting in Michael Kimberley's office. These drawings retained the use of the standard doors with a smaller removable roof panel and were much more practical as a solution but lost the aesthetic value of "clean space" through the convertible center of the car with the windows down.
The presentation caused Ing. Marmiroli and Ing. Venturelli (General Manager of ALSpA) to become very angry, shouting at Peter Stevens and myself insisting that the original design was best and that this alternative was "stupid".

18. During the entire time of my employment with ALSpA/ALUSA Inc. there was continuous tension between the different factions of management. There was an English faction (Michael J Kimberley- President, and myself – Sales and Marketing Director), an Italian faction (G. Venturelli – General Manager, L. Marmirolli – Technical Director, G. Girotti – Sales Manager and F. Ferraris – Financial Director) and P. Bianchi (Special Projects Director - who was Italian but had lived most of his life in the USA and who was loyal to the Indonesian owners). This situation caused an immense level of internal politics and paranoia which was not assisted by the company president who was incapable of making a decision within the company without prior referral back to Jakarta and the shareholder's executive management. This led to decisions not being made - at all - and the complete avoidance of any important or contentious issues within the company. In short, the Italian management did not want other nationalities involved in management at ALSpA. The company president, Michael Kimberley, would not take any stance against the Italian management unless told to do so by the Indonesian shareholders.

19. Peter Stevens' presentation was interpreted as a criticism of the Italian management's abilities by the English management and with no support from the company president, we were forced

to back down over the issue of the design of the L144 and were forced to endorse and support [illegible]ally defective Italian design. [illegible] potentially defective design is now reality as I am aware of multiple Lamborghini Diablo VT Roadster owners who have suffered the consequences of this decision.

20. Forced to accept the Italian design and its potential problems, I, at a later date, had discussions with Ing. Marmiroli in the factory and discussed the roof problems. Ing. Marmiroli had already been looking at alternative roof designs and had reviewed one, two and multiple section removable roof panels. These were rejected by the engineering department in favor of the single panel. When I asked Ing. Marmiroli about the window dropping mechanism and whether it could be made to work, he laughed and shrugged his shoulders.

21. When the first (pearl-red) prototype L144 arrived at the factory I personally inspected the car with Ing. Marmiroli for publicity purposes. At that time, Ing. Marmiroli stated that the problems with the car continued to be:

(a) body flex and the need to stiffen the chassis even more,

(b) the dropping window system and

(c) the door and roof seals which, even on the prototype showed that the car would not remain water tight.

22. I was then transferred by ALSpA to ALUSA Inc. in Jacksonville USA.

23. In recent conversations with Michael Kimberley, former President of Automobili Lamborghini S.p.A. (see paragraph 4 above), he admitted to me that the roof/door seals area of the L144 were re-designed some 12 times prior to the car being released for sales. For the car to finally be released, the Quality Manager of ALSpA, Ing. Aldrabandi had to demonstrate to Michael Kimberley that a prototype car did not leak and that the doors could be opened in an emergency by manually pushing the windows out at the top and forcing the door upwards. Michael Kimberley also confirmed to me that he had very little faith or trust in the Italian engineering of the L144 and in what he had been presented with. Michael Kimberley also admitted that there was significant pressure on him to release the car onto the market both for sales and because no new products from ALSpA had been released since the company had been acquired by the Indonesian/Malaysian consortium some 2 years earlier. The Diablo Roadster VT was then released for sale.

ND

24. With the knowledge that several customers have now experienced significant problems with their Lamborghini Diablo VT Roadster cars, specifically in the areas of:

   (a) Failures and malfunctions of the dropping window system and people being trapped in their cars;
   (b) Door and roof seals leaking significant quantities of water causing extensive damage to the interior of the car;
   (c) Overheating resulting in heat damage (discoloration and some components melting) at the rear of vehicles;
   (d) The air-conditioning system not adequately cooling the vehicle and;
   (e) Car batteries frequently going "dead" without warning and apparent cause.

25. I can confirm that the design of the Lamborghini Diablo VT Roadster was fundamentally defective from conception to production and that ALSpA/ALUSA put these cars into production and sold them to customers with full knowledge and expectation of the deficiencies of the design.

26. I am personally aware of the vehicle defects complained of by Lamborghini Customers: John Martin, Lonny Morganroth, Adam Weitsman, Mike Anderer, K.G. Johnson, Tim Blackman, Eduardo Cardoza. Each of these customers complaints stem from one or more of the vehicle defects cited in this affidavit.

Nigel R Gordon-Stewart.

The Foregoing affidavit consisting of 8 pages was signed before me this 21 of October 1998 by Nigel R Gordon-Stewart who produced identification and who did take an oath.

LARA M. PRESLEY
COMMISSION # CC 696716
EXPIRES NOV 16, 2001
BONDED THRU
ATLANTIC BONDING CO., INC.

NOTARY PUBLIC STATE OF FLORIDA

Notary – State of Florida, USA

# EXHIBIT C

Peter Stevens

The Forge
Blacksmith's Green
Wetheringsett
Suffolk IP14 5PZ
England

Telephone/Fax
(+44) 01728 861539

# Lamborghini Diablo Roadster

During 1994 I was paid by Lamborghini SpA as a consultant designer.

Among my tasks, I was asked to visit a prototype modelling company in Turin during the Autumn of 1994. The company was Cecomp SpA. I went to Cecomp with chief Lamborghini engineer Sig. L. Marmirolli to look at the proposed Diablo Roadster. At Cecomp we met Sig. M Gandini who was the designer of a previous Diablo show car. This was also a roadster, but without roof, side windows or a practical windscreen.

It was immediately clear to me that this second roadster was a seriously flawed concept. I pointed out some of the problems to Sig. Gandini who said it would be OK when it was finished. It was suggested that it was too early to comment on the car and that making it work was not my concern.

I was sufficiently troubled by the lack of engineering thought in the design that I wrote a report for the directors of Lamborghini. In that report I noted the following observations:

1. Because of the upward swinging "scissor" style doors (unlike the closed version) it would be impossible to open the doors with the roof on. (Lamborghini later proposed an automatic system to drop the windows prior to opening the doors.)

CONTINUED FROM PAGE 1

2. The window lift switches were exposed to rain should the roof not be fitted. These were cheap switches without waterproof cases.

3. Theré was no way to fit the roof onto the engine cover.
4. If the roof could be fitted to the engine cover it would not be possible to open the cover.

5. If the roof could be fitted to the engine cover it would become unacceptably hot.

6. The weather protecting door seal had to take a very poor path up the A (front) pillar of the car. there was no practical way of making that seal meet the seal on the removable roof panel.

7. It was very unlikely that the unsupported side glass would make a proper seal with the door seals.

I completed my report by suggesting that the car was a superficial styling exercise that was unlikely to make an acceptable road car.

I proposed two alternative schemes for a roadster, one with framed door glass (similar to the closed Diablo) and the other with a folding, two-part roof.

Unfortunately, because of the turbulent nature of Lamborghini management at that time, the frequent trips to Indonesia for the President's son and a strong culture of xenophobia, it was impossible to seriously debate any of these design issues.

Peter Stevens

October 21 1998

END